**IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES** | : | |
| | : | |
| | : | |
| **v.** | : | **Case No. SAG-23-074** |
| | : | |
| **DELANO HANDY** | : | |
| | : | |
| **Defendant** | : | |

**DEFENSE SENTENCING MEMORANDUM**

*"There's no tragedy in life like the death of a child. Things never get back to the way they were." - Dwight D. Eisenhower*

Delano Handy, 34, comes before this Court for sentencing as a different man than the one who committed the instant offense more than 3 years ago. The tragic death of his beloved 6-year-old son, ▮▮▮▮ after a brutal months long battle with a terminal disease has punished Mr. Handy in devastating ways. His grief and love for his son has motivated his commitment to change.

Mr. Handy has made deliberate choices to change himself, his thinking, and how he shows up for himself, his family, and our society. In reflecting on why he has changed, he said "I could lose any of my kids at any time and I have to be a good example for them and be there for them." His faith has cemented his commitment to change, "My belief system. I have to do a lot of good to get to paradise with my boy. I want to see my boy, hold him and play with him." "I know I made mistakes in my past. And I know I have to do twice as good to make up for it in God's eyes." Mr. Handy has said about this



*Figure 1:* Mr. Handy with ▮▮▮▮

offense, "This won't happen again because that is not me. I ain't that person today."

Mr. Handy was incarcerated from his arrest on November 2022 until April 2023. During that time, his 6-year-old son, ⬚⬚⬚, was

Mr. Handy lives with deep regret over being arrested and charged with this crime during the last year of his son's life. He has to live every day knowing that he missed out on precious last moments with ⬚⬚⬚ because of his conduct in this case. That has been punishing. In tribute to ⬚⬚⬚, Mr. Handy made the decision to change himself and his life. Today, when Mr. Handy speaks of ⬚⬚⬚, he cries. He says, "⬚⬚⬚—that was my guy. And I was his." He went on to say, "My boy [ ⬚⬚ ] looked up to me and he looked at his father in a certain light as a loving, caring, role model. He knew I went to work and took care of him. And it was important to me to honor that." In sum, life has punished Mr. Handy and fueled his rehabilitation more than prison ever could.

 He has committed himself to being better for his family, for himself and to honor ⬚⬚⬚. While on pre-trial release he has done very well. He has consistently held a job. He completed an HVAC program and received his certification. He has consistently been in therapy for the last 3 years. Most recently, he has begun taking medication for his mental health as part of his treatment plan. Mr. Handy drops off and picks up his kids from school Monday-Friday.  Through his actions, Mr. Handy has shown that he has been punished, deterred, and rehabilitated.

Mr. Handy has vowed to be a good father, a supportive husband, to excel on pre-trial release, and to process the great tragedy that has befallen him and his family. His mother, Raquida Shaheed writes in her letter to the Court about her son's actions in the wake of the death of her grandson, "One of the greatest tests of his character came in 2023, when he lost one of his children who was only six years old. No parent should ever have to face that kind of pain. I watched my son break on the inside yet still stand strong for his family. He worked through unbearable grief, taking on every responsibility to make sure his child received a beautiful and proper funeral. He handled every detail, every cost, every moment—not because he had to, but because his love for his child was that deep."[1]



*Figure 2: A necklace Mr. Handy wears every day that shows ____ before chemotherapy (L) and after chemotherapy (R)*

The past 3 years proves that Mr. Handy has been deterred. In particular, what makes Mr. Handy stand out from others—and should give the Court confidence in his future—is that he did not collapse and return to old habits in the wake of his son's death. He did not return to substance abuse. He did not return to crime. He did not give up on life by stopping working or not going to therapy. He took his pain and transformed himself into someone he, his living children, and his deceased son would be proud of. He takes this case seriously and has demonstrated such through his actions on pretrial release.

Over a period of 3 years, Mr. Handy has been punished, deterred, and rehabilitated, and because of that, the Defense is respectfully requesting a time-served sentence. For the reasons

---

[1] Exhibit B, Raquida Shaheed Letter to the Court.


*Figure 3: Mr. Handy with his wife, Kylah (c)*

explained in this memo, a time-served sentence is the sentence that is no greater than necessary to meet the purposes of sentencing under §3553 (a). If the Court feels further punishment and deterrence is necessary, the Defense requests a period of home detention. A sentence of home detention would impose a punishment and remove Mr. Handy's liberty. This sentence would also recognize a real need for Mr. Handy to continue supporting his family emotionally and financially, especially after ▮▮▮ death. It would also acknowledge that great strides Mr. Handy has taken to reform himself by consistently being in mental health treatment, working, and staying out of trouble. And it would allow Mr. Handy to maintain the strong pro-social bonds he has built, rather than interrupt them with a period of incarceration.

## **ARGUMENT**

### I.    The Advisory Guidelines Do Not Account for the Mitigating Factors Present, Making a Significant Downard Variance to a Time-Served Sentence Appropriate.

As this Court is aware, § 3553(a) directs courts to impose a sentence that is sufficient, *but not greater than necessary,* to comply with "the purpose of sentencing." *See* 18 U.S.C. § 3553(a) (emphasis added). The parties agree that the advisory Guidelines are 84-105 months corresponding to an adjusted offense level of 25 and a criminal history category of IV. The Defense recognizes—and embraces—the fact that a time-served sentence represents a significant downward variance. For all of the reasons argued herein, the adjusted offense level and the criminal history category do not account for

significant mitigating factors of this case (including because they are not designed to reflect them) and the fact that, over the course of 3 years, the sentencing goals have been met. In this section, the Defense highlights some of the most important mitigating points the Guidelines do not account for that we respectfully ask this Court to consider.[2]

First, the adjusted offense level of 28 does not consider that the gun was unloaded, a fact that is different than most cases in which § 2K2.1 applies. There are defendants with the same adjusted base offense level as Mr. Handy where the gun was loaded, where there was ammunition in the car or nearby, and where there was a magazine with ammunition and even an extended magazine with ammunition. None of these facts are present in this case. In sum, the adjusted offense level is inflated compared to similarly situated defendants and, because of that, Mr. Handy deserves a downward variance to account for his less aggravated offense conduct.

Second, both the adjusted offense level and the criminal history category of IV take into account two felony-controlled-substance offenses that occurred over a decade ago when Mr. Handy was 20-21 years old. The Defense is not disputing that both of the offenses count for guidelines calculation purposes. However, it is important to note that Mr. Handy is different from other defendants who have more recent convictions and violent ones and, for that reason, also deserves a downward variance.

---

[2] In the 2025 edition of the Sentencing Manual, the U.S. Sentencing Commission chose to simplify the prior three-step sentencing process to a two-step process. Under the new two-step process, there is no reference to departures. This change is better in line with the steady decline of departures since *Booker*, as courts increasingly relied to a greater extent on variances in ways consistent with § 3553(a). The 2025 Guidelines now have "…a two step process whereby the sentencing court must first correctly calculate the applicable guideline range as the 'starting point and initial benchmark' and then must determine an appropriate sentence upon consideration of all the factors set forth by Congress in 18 U.S.C. § 3553(a*). See Gall v. United States*, 552 U.S. 38, 49–51 (2007)." Sentencing Commission, Amendments to Sentencing Guidelines, page 81 (April 30, 2025). https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/202505_RF.pdf. The new sentencing manual highlights the great importance of courts considering a defendant's history and circumstances under § 3553(a).

Third, Mr. Handy's criminal history category does not account for his excellent behavior while on pretrial release. It does not account for the fact that he been consistently employed and in therapy. Mr. Handy has transformed into a pro-social and active member of our community. In sum, his criminal history does not account for dated convictions or his excellent behavior on pretrial release.

Fourth, Mr. Handy has been punished in many ways. The death of his 6-year-old son during the pendency of this case haunts him. His own actions led him to miss on some of the precious final days and months while he was incarcerated from November 2022 to April 2023, and on home detention. Mr. Handy carries that pain with him. He has been further punished by realizing that his own actions will may very well lead to him being absent from his children's lives during the hardest moment of their young lives. That he will ultimately cause his children more pain by his own actions. This is a deep and profound punishment that Mr. Handy lives with each day.

It is important for courts to take this step seriously because the guidelines fail to consider them at all. In Mr. Handy's case, the guidelines do not consider that the gun was unloaded, the depth of the impact of the loss of his 6-year-old son has had on him, his excellent behavior on nearly 3 years of pretrial release including therapy and consistent employment, and his growth into a person who is a pro-social and active member of our community. When all of these mitigating factors are taken into account, it is clear that a guidelines' sentence would be greater than necessary to meet the purposes of sentencing for the reasons laid out below.

This section only highlights some of the most significant reasons that a significant downward variance from the advisory Guidelines is appropriate in this case. Additional points detailed below are also incorporated in this section.

## II.    Mr. Handy's History and Characteristics Warrant a Downward Variance. [3]

Mr. Handy was the firstborn grandchild on both sides of his family. He was born to his parents, Raquida Shaheed, and Delando Handy, Sr., at Mercy Hospital on April 3, 1991. His parents were just teenagers when he was born. Mr. Handy's childhood and adolescence were marked by inconsistent parenting, housing instability, exposure to violence and drugs, and negative influences that introduced him to criminal activity as a teenager. The lack of reliable and positive adult role models combined with instability and poverty led Mr. Handy down a tortured path from his teenage years through adulthood.

### i.    *Mr. Handy's unstable childhood and exposure to negative influences led him down the wrong path.*

Less than a year after Mr. Handy was born, his parents had their second child—his sister Kecia. Mr. Handy and his sister were very close, and are still very close to this day. His mother took care of Mr. Handy and his sister with family support until she was a little older. Not long after he was born, Delano Handy Sr. began to sell drugs. His father served about a year of incarceration when Mr. Handy was in kindergarten. Mr. Handy's father did not provide for Mr. Handy or his sister. His mother struggled to make ends meet. The family moved every year.  They lived all over West Baltimore. His maternal grandparents were heavily involved in the family's life and supported them in times of shortages.

His parents separated shortly after he was born. His mother met his stepfather, Robert Gooden, Jr., when Mr. Handy was three years old. They married and went on to have three daughters. Mr. Handy was close to his stepfather until his death in 2025.

Mr. Handy's father was not very present and often would miss visits or not show up when he said he would. Mr. Handy's father was not involved in his life despite the fact that Mr. Handy wanted

---

[3] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ by Rebecca Bowman-Rivas, LCSW-C, attached as Exhibit A (filed under seal) is the source of most of the information in this section. Along with interviews with Mr. Handy conducted by undersigned counsel, and the PSR interview.

a relationship with his father. His father had remarried and had more children. Mr. Handy struggled with feelings of abandonment and neglect. In addition, Mr. Handy's mother used physical discipline when he was growing up—often beating him with whatever was around from a belt to a spatula.

When Mr. Handy was only 9 years, he witnessed his first shooting when he saw someone get shot less than 100 feet away from him. He saw drug deals and other kinds of violence in his neighborhood from a young age. By the time he was 10 years old, Mr. Handy was regularly smoking marijuana and drinking.

By the time Mr. Handy was in middle school, he was working with his grandfather on the weekends, helping him sell clothes at the Patapsco flea market. He helped his grandfather run his 4 stores and 16 tables at the flea market. He was giving the $300 a week he made to his mother to save for him. A few years into working, he discovered that his mother has spent the money. At 13, he began to struggle in school and at home. His mother describes his attitude around this time as negative and angry. That same year his mother kicked Mr. Handy out in the middle of the night when they got into a dispute over money. She first gave Mr. Handy to his father. Sadly, his father did not want him and took him to his grandmother, Cecilia Waaldijk, with a bag of clothes and $100.

Mr. Handy lived with his grandmother until he was around 15 years old after an extended custody battle between her and his mother. Around this time, his step father, who struggled with substance abuse, went to prison for drug related charges. Mr. Handy returned to live with his mother that same year, but spent most of his time on the east side with his paternal cousins. He often bounced back and forth between his parents' homes. No one was really checking for where he was or where he was going. His cousins and their friends were older than him. They offered many of the things he was missing—a sense of belonging and community, guidance, and attention. These cousins and their friends introduced Mr. Handy to drugs and ultimately drug dealing.

Mr. Handy managed to graduate high school from Maritime Industries Academy in 2010. After he graduated from high school, Mr. Handy continued to sell drugs. He was arrested for the first time in 2011 at age 20 for selling cocaine. Mr. Handy would spend the next several years in and out of trouble— with the longest period of incarceration he serves being approximately one year.

*ii.    Mr. Handy changes for the better when he meets Kylah,*

Mr. Handy met his wife, Kylah Handy, in early 2018. Mrs. Handy had a

and                                     .          s father was not involved in his life. Mr. Handy was the only father          ever had.          had some

As Mrs. Handy and Mr. Handy became more serious in their relationship, Mr. Handy stepped into a father role for                          . Mr. Handy took this role seriously and stopped selling drugs. His last conviction for a drug-related offense happens just as he is getting know Mrs. Handy.

Mr. Handy says that          made him change. He taught          how to walk and talk. nickname for Mr. Handy was "Daddy Big Dog" and Mr. Handy affectionately called          "Big Dog." He and          were father and son in everything but blood.          father was still in his life. This did not interfere with Mr. Handy developing a close step-father relationship with as well.

*iii.    Mr. Handy and Kylah get married and expand their family.*

Mr. Handy and Mrs. Handy got married approximately 4 years ago. Around this time, they had their daughter

has struggled with his health since birth.



Mr. Handy loves being a father and takes his role as a provider and caregiver seriously. He worked hard to provide for his family. After a period of doing odd jobs, he found a stable job at Flagger Force in the summer of 2022.[4] He was working 60-80 hours per week. Mrs. Handy worked in IT and medical coding, which is a completely remote job that allowed her to work from home. Her last contract was through Tech Systems. She is currently on maternity leave.

*Figure 4: Mr. Handy with his*

In 2019,          father and Mr. Handy got into a disagreement. During this disagreement,           father pulled out a knife and stabbed Mr. Handy in the abdomen nine times. He underwent surgery after the stabbing, which removed part of his intestines. After the surgery, Mr. Handy was prescribed Percocet to help with his pain. He was concerned about taking Percocet and the risk of becoming addicted. Mr. Handy chose to use marijuana as a remedy for his pain instead. He has keloids on his abdomen from the stab wounds. The keloids from the stab wounds, continue to this day, to cause Mr. Handy pain and discomfort.

iv.     *Mr. Handy is arrested for the instant offense.*

Up until his arrest for the instant offense in November 2022, Mr. Handy worked 60-80 hours per week for Flagger Force.[5] On an average day, Mr. Handy would wake up at 4:30 a.m. and work

---

[4] Exhibit D, Letter of Employment, Flagger Force
[5] *Id.*

until 8 p.m. He picked up extra shifts and emergency late-night shifts at Flagger Force. He also made extra money by helping his two uncles. Mr. Handy worked with his Uncle Garland Fields, who owns a company that installs fire sprinklers, and his Uncle Mike Fields, who owns a fiber optics and camera company installing cameras, fixing wires, and installing electrical sockets.

On November 23, 2022, at 6:04 p.m., Mr. Handy was on the way home from work when he was stopped by Baltimore City Police. Officers told him he was stopped because his car was displaying expired vehicle registration stickers. During the course of this stop, officers located an unloaded firearm in his car in a black bag containing work items on the passenger side floorboard. Mr. Handy was arrested and charged in state court. He was held on the state case. The state case was dismissed and brought federally in 2023. Mr. Handy had his initial appearance on April 6, 2023. His son ▒▒▒▒ age 6, was diagnosed in early April ▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒ ▒▒▒▒▒▒▒▒▒▒▒▒. ▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒. Shortly after, Mr. Handy was released on April 19, 2023.

v.     *The tragic death of his beloved son* ▒▒▒▒ *and the hard years that follow.*

Mr. Handy was incredibly thankful that he could be with his son and his family during this difficult time. Up until November 2023, ▒▒▒▒ was in and out of the hospital. When he was in the hospital, Mr. Handy would rush to the hospital every day from work. If ▒▒▒▒ wanted IHOP or McDonald's at 3 a.m., Mr. Handy went and got it. When he had to work late, he would video chat ▒▒▒▒ at the hospital. Mr. Handy was with ▒▒▒▒ every step of the way.

In November 2023, ▒▒▒▒ health began to deteriorate further. Sadly, Mrs. Handy and ▒▒▒▒ were in a terrible car accident after a driver ran a red light. ▒▒▒▒ was admitted to the hospital for what would be the last time. ▒▒▒▒ was too weak to withstand the trauma from the car accident. By the end of November 2023, doctors gave the family the devastating news that there was nothing more they could do for ▒▒▒▒.

On December 1, 2023, Mr. Handy went to work at Flagger Force. While he was at work, he got the call that ▭ was in his final hours of life. Mr. Handy rushed to his side. ▭

After ▭ died, Mr. Handy tended to him, washed his body, and wrapped him in a blanket. Mr. Handy and Mrs. Handy recall with tears that when they walked out of the hospital room that day, the hall was lined with hospital staff there to support them. There are no words to describe the grief and pain Mr. Handy, his wife, and his family feel over the death of ▭. They are all still processing his loss to this day. 11-year-old ▭ took ▭ death particularly hard.



Mr. Handy and his wife have had ▭ Mr. Handy has been a source of support for ▭ during this time. He picks ▭ from school every day. He walks each of his children into school every morning. While on release, Mr. Handy has taken ▭ to different events around town including a trip to Raven's Training Camp with ▭. He is there for ▭

Mrs. Handy describes Mr. Handy and his relationship with ▇▇▇▇ in her letter to the court,[6] "Our oldest child living with us, ▇▇▇▇ has struggled deeply with grief following ▇▇▇▇ passing. Delano has made it a priority to spend extra time with him, offering patience, understanding, and guidance. He has taken on the emotional work of helping ▇▇▇▇ process his grief, especially during times when his pain shows through behavioral challenges."

After his son's death, Mr. Handy and the family continued to experience tragic losses. In November 2024, Mr. Handy's cousin, Timothy Cartwell, was killed while collecting trash as an employee of Baltimore City Department of Public Works (DPW) when his trash truck's brakes failed and ran over him. His maternal aunt also died that year. In August 2025, Mr. Handy's stepfather died.

For many, the death of their child would derail them but not Mr. Handy. While on pretrial release, Mr. Handy has maintained consistent employment, obtained his HVAC certification, been there for his wife and children, and been in mental health treatment. He has not picked up any new charges, except for minor traffic citations.

### III. The Nature and Circumstances of the Offense Warrant a Significant Downward Variance, Particularly Considering the Gun Was Unloaded, No Ammunition was Found, and There Was No Violence.

Mr. Handy acknowledges that his conduct in this case is serious and he makes no excuses for his conduct. Defense counsel asks the Court to consider that while all gun cases are serious, § 3553(a) requires a more nuanced analysis that looks at the relative severity and mitigating circumstances of the offense. Here, the offense began as a traffic stop that was initiated because officers observed expired tags on the vehicle Mr. Handy was driving.  When officers searched Mr. Handy's car on November 23, 2022, they found a Hi Point .40 caliber handgun with no round in the chamber, and none in the magazine. The gun was in a black bag on the passenger side floorboard.

---

[6] Exhibit B

To be direct, the gun was unloaded with no ammunition. Furthermore, officers did not recover any bullets in Mr. Handy's car or from his person. This matters for at least three reasons.

First, it is uncommon in 922(g) cases for there to be no bullet in the chamber, no bullets in the magazine, and no bullets found anywhere near the gun or on the defendant's person. Mr. Handy never intended to use the gun to hurt anyone, which is why it had no bullets and no ammunition was anywhere in the car.

Second, Mr. Handy had the unloaded gun to use for his protection if necessary, nothing else. Mr. Handy was not using the gun in connection with any other offense, and there are no allegations that Mr. Handy attempted to use the gun, fired the gun, brandished the gun, or used it violently.

Third, Mr. Handy was compliant and cooperative throughout the traffic stop and subsequent arrest. He was stopped for expired tags, not because he was driving erratically. He was stopped by officers on his way home from work, not because he was doing anything nefarious.

## IV. Time Served Is the Sentence that Is Not Greater than Necessary to Meet the Purposes of Sentencing.

A time-served sentence is sufficient and advances the sentencing goals laid out in § 3553(a)(2). The sections that follow assess each of the relevant factors and explain why each overwhelmingly supports a time-served sentence.

### a. A time-served sentence effectuates just punishment and promotes respect for the law.

#### i. *Mr. Handy has been punished, and his good behavior on pretrial release promotes respect of the law.*

Mr. Handy has been punished. *First*, he has served a period of prison time, when he was incarcerated from November 2022 until April 2023. He regrets that this is time he missed with          . *Second*, this period of incarceration was particularly punishing because his son was first diagnosed during this period. Accordingly, he was not able to support his family during that difficult time. He knew his own actions prevented him from supporting his family or being with his son. *Third*, when

Mr. Handy was released, he was released to [redacted]

[redacted] Mr. Handy had to watch as

[redacted]

[redacted] . He was there when [redacted] was tired and angry. He
was there when [redacted] was scared and sad. Mr. Handy was
at every doctor's visit and every hospital stay. He watched
as his son's 6-year-old body tried to fight off a brutal
disease. *Fourth*, Mr. Handy has carried with him the deep
regret that his son died without seeing his father be who
he is today. Mr. Handy will carry that regret for the rest of
his life. *Fifth*, Mr. Handy knows that his own actions have



*Figure 6:* Mr. Handy (L) and

led to the possibility that he will be further separated from his family, possibly for a lengthy period of
time, and unable to help support them during this difficult time for potentially years. This haunts him
and has served as an additional punishment.

Promoting respect for the law in this case is acknowledging that Mr. Handy has performed
well on pretrial release. Acknowledging that in sentencing sends a message to other defendants that
respecting the law be rewarded and that not doing so will be punished. Mr. Handy's demonstrated
behavior on pretrial release and recidivism research support that he has been rehabilitated and will
continue to be a law-abiding, pro-social member of society. Mr. Handy has done so in the face of
incredible grief. Not only did he lose his son but he also lost his stepfather to whom he was very close.
He also experienced several other familial deaths during the last 3 years. The death of a child, alone,
is a very traumatic event. Many people might collapse back into old habits. Mr. Handy has not.

*ii.  Just punishment should consider the impact of prison on Mr. Handy's children.*

Any decision about just punishment must take into account the impact a prison sentence would have not just on Mr. Handy, but on his family as well.  It is certainly true that most of the defendants that come before this Court have children. However, the circumstances of this case warrant special consideration of Mr. Handy's potential incarceration on his children and wife. It is rare that a Defendant comes before the Court for sentencing having recently suffered the devastating loss of a child, and are in the process of shepherding the rest of their children through the agonizing aftermath of losing a 6-year-old sibling. That makes this case different.

The absence of a parent and its negative effects on children is more heightened in the context of a child experiencing the death of a sibling. "The death of someone special can be very difficult and sad for a child or teen, but when it is a sibling who dies, the family faces a unique set of challenges. Siblings often have very complicated relationships."[7]  In particular, "[s]isters and brothers experience a range of sometimes conflicting feelings for each other—they may love and look up to one another, older siblings may feel responsible for, enjoy and/or resent caring for younger ones, or they may be jealous and fight—and their relationships can change over time. When a sibling dies, these past relationships and feelings can affect the surviving child's grief and the family's bereavement


*Figure 7: Mr. Handy holding �{■■■}*

---

[7]  The National Child Traumatic Stress Network. *Sibling Death and Childhood Traumatic Grief: Information for Families.* 2009.
https://www.nctsn.org/sites/default/files/resources/sibling_death_and_childhood_traumatic_grief_families.pdf

process."[8] Children grieving the loss of a siblings can experience survivor's guilt about being alive, regrets and guilt about things they did or said to the deceased sibling, and questions to related to their beliefs and faith. Grief reactions in children can show up in many ways "[f]or example, grieving children or teens of any age may sleep or cry more than usual. They may regress and return to earlier behaviors, or they may develop new fears or problems in school. They may complain about aches and pains. They may be angry and irritable, or they may become withdrawn and isolate themselves from family and friends." [9] Research also suggests that "One of the primary mechanisms of resilience for children is positive relationships with parents and other caregivers, which foster protective psychological processes…"[10]   Taking this together, children experience deep grief and complex emotions surrounding the death of a sibling. They need the support of their parents and familial network as they navigate grief. In sum, Mr. Handy's absence will have a tremendous impact on his living children and his wife as they continue to process the death of

death has had a profound impact on Mr. Handy's family, especially his children. Mrs. Handy describes his relationship with his children in her letter to the Court, "As a father, he shows up in every way possible. He is there for the big moments, like school events, and the quiet, everyday moments that matter just as much. Our children adore him. Throughout the day they often ask me to call him, and when he comes home, they all run to him without hesitation. Their love for him is pure and unmistakable."[11]

, in particular, has had an incredibly challenging time adjusting to his brother's death.

---

[8] *Id.*
[9] *Id.*
[10] Laurel Davis and Rebecca J Shlafer. *Mental health of adolescents with currently and formerly incarcerated parents.* J. Adolesco. 2017 January; 54: 120-135. https://pmc.ncbi.nlm.nih.gov/articles/PMC5549675/
[11] Exhibit B

since his brother died. Mr. Handy picks up and drops off his children at school every day. With

_____ Mr. Handy races him into the building every day. It gets _____ pumped up for school

with one of his favorite people, his dad.

Mr. Handy's _____

_____

_____ Mr. Handy and his wife share the care of their five children—Ms. Handy just had their fifth

child on December 9, 2025. Mr. Handy's incarceration will be a loss of shared caregiving with his wife.

Mr. Handy's children will be devastated if their father is incarcerated. _____ and Mrs.

Handy, it will make what is already a challenging time as they continue to process _____ death, all

the more challenging.

Research on the impact of parental incarceration supports this argument. Not only is

incarceration of a parent a stressful event for children, it often leads to "multiple emotional and social



difficulties, including exposure to the parent's criminal activity, witnessing the parent's arrest and court proceedings, separation from parents, loss of family income, housing instability, changes in caregiving, stressful visits with the incarcerated parent, and shame or stigma associated with a parent's involvement in the criminal justice

*Figure 8:* Mr. Handy with _____

system."[12] An additional impact "of parental incarceration and the stressors associated with it compromised emotional well-being of children."[13] It is well known that parental separation, regardless of the means i.e. parental death, divorce, military service, incapacity, or incarceration, has a profound impact on children.[14]  The impact of carceral separation on a child depends on "…the child's age and length of separation, reactions can include such things as inability to form later attachments, woebegone searching, numbing, self-blame, anger, depression, regression, and antisocial behaviors."[15] Put simply, the loss of a parent, particularly via incarceration, has negative impacts on a child's mental health and emotional development.

### b.  A time-served sentence effectuates adequate specific and general deterrence.

Mr. Handy has been specifically deterred for several reasons. *First*, Mr. Handy served 147 days of incarceration, almost 5 months, in this case from November 23, 2022, until April 19, 2023. During that time, he was away from his close-knit family, unable to support his children or wife, and incarcerated when his 6-year-old son became terminally ill. This time served as punishment for Mr. Handy and sent him a strong message.

*Second*, he will have been on pre-trial release for almost 3 years by the date of sentencing on February 4, 2026. He was released on April 19, 2023, to 24/7 lockdown with electronic monitoring. *See* ECF. 16. On May 24, 2023, Mr. Handy was granted permission to leave his residence to attend his children's medical appointments. *See* ECF 18.  On June 13, 2023, Mr. Handy was granted permission to leave his residence for work, to take out the trash once per day, and mow the grass outside his

---

[12] Rebecca Shlafer and Laurel Davis, *Mental Health of Adolescents with Currently and Formerly Incarcerated Parents,* J. Adolesc. 2017 January; 54: 120-135 (citing (Murray, Farrington, & Sekol, 2012). https://pmc.ncbi.nlm.nih.gov/articles/PMC5549675/
[13] *Id.*
[14] Lois E. Wright, Ph.D and Cynthia B. Syemour, J.D., *Effects of Parental Incarceration on Children and Families,* Michigan Family Impact Seminars, March 2002. https://evidence2impact.psu.edu/wp-content/uploads/2023/05/s_mifis05report.pdf
[15] *Id.*

home once every two weeks. *See* ECF 20. On July 25, 2023, the condition of electronic monitoring was removed. *See* ECF 23. On August 1, 2023, Mr. Handy was granted removal of the condition of a third-party custodian and allowed to reside with his wife. *See* ECF 24. For Mr. Handy, the last 3 years have been anxiety-ridden because he knew he was going to have face the consequences of his actions in this case, and not knowing the sentence this Court will impose. He has worked 2 sometimes 3 jobs to save money for his family while he incarcerated. Mr. Handy has lamented over how his own actions will lead to the tragic consequence of being separated from his wife and children as they continue to grieve.

*Third*, the death of his son has had a profound impact on Mr. Handy. Prior to his son's death, Mr. Handy did not truly grasp the brevity of life, how quickly someone can be here and gone the next, or how important time with his family is to him. His youngest children and his wife need him now more than ever. For Mr. Handy this case and the impending punishment for his actions have served as punishment for him. Mr. Handy made a promise to himself that he would do better after his son's death. And he has. He has been specifically deterred by the tragedy of losing a child.


*Figure 9:*

As to general deterrence, the facts of Mr. Handy's case are very specific because of his personal history and characteristics. Given the uncommon nature of people in federal court with unloaded guns with no bullets on or around them, general deterrence likely has a more limited impact in this case. To the extent that a message is being sent to the public, it is one of punishment. Mr. Handy served 5 months of incarceration in this case and has been on pretrial release for 3 years because of his good behavior, not because of any leniency.

Furthermore, research has shown that the certainty of being caught is a more powerful deterrent than punishment. "Criminological research over several decades and in various nations generally concludes that enhancing the certainty of punishment produces a stronger deterrent effect than increasing the severity of punishment." *See* Valerie Wright, The Sentencing Project, *Deterrence in Criminal Justice: Evaluating Certainty Versus Severity of Punishment* 4 (Nov. 2010).[16] Daniel Nagin, a leading deterrence scholar, concludes that "[t]he evidence in support of the deterrent effect of the certainty of punishment is far more consistent and convincing than for the severity of punishment" and that "the effect of certainty rather than severity of punishment reflect[s] a response to the certainty of apprehension." Daniel S. Nagin, *Deterrence in the Twenty-First Century: A Review of the Evidence*, Crime & Justice, Vol. 42, No. 2013. The Department of Justice's own National Institute of Justice has issued guidance reflecting just that: "[i]ncreasing the severity of punishment does little to deter crime" and "[t]he certainty of being caught is vastly more powerful deterrent than the punishment." *See* U.S. Department of Justice, Office of Justice Programs, National Institute of Justice, *Five Things About Deterrence* 1-2 (May 2016).[17] The reasons for this result are complicated but lay, in part, in recognizing that severe punishment does not "chasten" defendants in the way most people think. "Some policymakers and practitioners believe that increasing the severity of the prison experience enhances the 'chastening' effect, thereby making individuals convicted of an offense less likely to commit crimes in the future." *Id.* "In fact," the guidance notes, "scientists have found no evidence for the chastening effect." *Id.*

---

[16] https://www.antoniocasella.eu/nume/Wright_2010.pdf
[17] https://www.ncjrs.gov/pdffiles1/nij/247350.pdf.

**c. Protection of the public is served by Mr. Handy's excellent behavior on pretrial release, and a period of supervised release to follow.**

Protection of the public has, in many ways already, been served by Mr. Handy's time on pretrial release. During that time, Mr. Handy has not obtained any new criminal charges and no violation petitions have been filed. Furthermore, Mr. Handy has remained consistently employed, obtained his HVAC certificate,[18] been consistently in therapy, begun taking medication for his mental health, and been an active and supportive husband and father to his family as they continue to adjust to their traumatic loss. This demonstrates two things. First, that court supervision has and can protect the public. And second, that Mr. Handy has changed as a person and his growth has led him to become a pro-social, law-abiding citizen.

In this case, a prison sentence does not protect the public but does the opposite. A prison sentence will place Mr. Handy in an environment with anti-social and criminal influences after he has made great efforts to be pro-social and law-abiding. Furthermore, it will lead to the destabilization of his pro-social relationships and loss of his employment. Current criminological research shows that "…that custodial sanctions have no effect on reoffending or slightly increase it when compared with the effects of noncustodial sanctions such as probation." [19] In sum, a time served sentence with a period of supervised release will protect the public.

**d. A Time-Served Sentence Reflects Mr. Handy's Demonstrated and Continuing Commitment to His Own Rehabilitation and His Strong Family Support.**

Mr. Handy is committed to continuing to be a law-abiding citizen who takes care of his family, works hard, and supports his mental health. He has an incredible family who is ready and willing to

---

[18] See Exhibit C. All State Career Diploma for Heating, Ventilation, Air Conditioning & Refrigeration Diploma, January 5, 2025

[19] Damon M. Petrich, Travis C. Pratt, Cheryl Lero Jonson, and Francis T. Cullen. *Custodial Sanctions and Reoffending: A Meta-Analytic Review,* The University of Chicago Press Journal, Volume 50 (2021).

support him in the community. His family wrote 10 letters of support on his behalf[20] and will be in the courtroom on February 4.



*Figure 10: A family trip to a corn maze in 2024 for Duquesne birthday. His sister Kecia (center), his half-younger sisters, Keyonna and Mariah (top right), his younger half-brother, Delano (top-center).*

Mrs. Handy writes in her letter to the court about Mr. Handy

s

---

Furthermore, Mr. Handy has continued to be employed while released. He is currently working full-time as an auto mechanic at 5 Star Car Care Center LLC. His supervisor and owner of the auto mechanic shop, Darrell Grissom, told undersigned counsel that Mr. Handy "does good work and shows up on time." Mr. Grissom spoke highly of Mr. Handy's work ethic and his commitment to his job. In addition to work, Mr. Handy successfully completed an HVAC program and received his diploma from All State Career on January 5, 2025.[22]

Mrs. Handy writes about her husband in her letter to the Court, "Despite working extremely long hours, sometimes as many as sixteen hours a day, Delano still comes home and immediately helps with the children, the household, and my emotional well-being. He does this without complaint and without hesitation. He never allows exhaustion to stop him from being present for his family."[23] His mother, Raquida Shaheed, writes in her letter, "In recent years, Delano has stayed focused, stayed out of trouble, and poured every part of himself into working and taking care of his family. He is not a man who runs the streets or causes harm. He is a man who punches the clock, pays his bills, raises his children, and does everything he can to be the father they deserve and the man his community can rely on."[24] She goes on to write, "As a mother, I have watched him grow, struggle, hurt, and rise. I have watched him carry burdens that would break



*Figure 11 :* Mr. Handy with his mom, Raquida Shaheed, and

---

[21] Exhibit B
[22] *See* Exhibit C. All State Career Diploma for Heating, Ventilation, Air Conditioning & Refrigeration Diploma, January 5, 2025.
[23] Exhibit B
[24] Exhibit B, Raquida Shaheed Letter to the Court

many people. I have watched him choose responsibility when life gave him every reason to fall apart. That is the Delano I know — a man with a big heart, a strong spirit, and a deep love for his family." [25] His sister, Kecia Handy, writes in her letter,[26] "He is defined by the father who wakes up early to care for his children, the son who carried our family through two devastating losses, the brother who shows up without being asked, and the man who always puts others before himself." His grandmother, Cecelia Waaldijk, writes in her letter, "He is supportive, dependable, and always there when I need him. I'm not getting any younger, and having my grandson close by gives me comfort and peace."[27]

## V.     There Are Multiple Factors in This Case That Warrant a Disparity in Sentencing.

The need to avoid unwarranted sentencing disparities is one of the many factors that this Court must consider when conducting the balancing test under 3553(a). Yet, sentencing is a very individualized analysis. *Gall v. United States,* 552 U.S. 28. Moreover, in *Gall v. United States,* the Supreme Court highlighted that sentencing courts must avoid unwarranted similarities among defendants who are *not* similarly situated. *Id.* In this case, a significant downward variance to a sentence of time-served is warranted for all of the reasons discussed above, even if it results in a disparity from the JSIN data.

## <u>CONCLUSION</u>

It is for these reasons that Mr. Handy ask this Court to sentence him to time served.

Respectfully submitted,

_____/s/_____
Dara Jackson-Garrett
Assistant Federal Public Defender
100 South Charles Street
Tower II, 9th Floor
Baltimore, Maryland 21201
Phone: (410) 962-3962
Fax: (410) 962-3976
Email: dara_jackson-garrett@fd.org

---

[25] *Id.*
[26] Exhibit B, Kecia Handy Letter to the Court
[27] Exhibit B, Cecelia Waaldijk Letter to the Court